MIDLOTHIAN IRON MINING COMPANY, Respondent, vs. BEL-
KNAP and others, Appellants.

CUMBERLAND IRON MINING COMPANY, Respondent, vs. BEL-
KNAP and others, Appellants.

*November 1 — November 16, 1900.*

**(1)** *Tax titles: Limitations: Interruption of constructive possession.*
    **(2)** *Value and quantity of timber wrongfully taken.*

**1.** At the time of the recording of tax deeds the lands, consisting of
    adjoining government subdivisions, were vacant and unoccupied.
    Thereafter the several original owners of such lands united in
    building a substantial log cabin on one of the subdivisions, and used
    and occupied the same continuously for about eight months, keep-
    ing there a crew of men, averaging seven or eight in number, who
    during all of said time were engaged in prospecting for iron ore
    and digging test pits over the whole tract. All this took place
    within three years after the recording of the tax deeds. *Held,* that
    such possession on the part of the original owners interrupted the
    constructive possession of the grantees in the tax deeds and the
    running of the statute of limitations (sec. 1187, Stats. 1898) in their
    favor, and created a bar against them.

**2.** Upon the evidence (stated in the opinion) in an action to recover
    the value of timber unlawfully cut, a finding as to the value per
    thousand feet is left undisturbed, but a finding as to the quantity
    taken, based on a full scale of all the timber cut as if it were sound,
    straight, and entirely merchantable, is *held* unwarranted, and the
    maximum amount for which defendants should have been held
    liable is determined.

APPEALS from judgments of the circuit court for Bayfield
county: JOHN K. PARISH, Circuit Judge. *Modified in the
Midlothian Case; affirmed in the Cumberland Case.*

Two actions to recover the value of certain timber cut by
defendants upon lands owned by the plaintiffs. The de-
fendants justified under tax deeds. In the *Midlothian Case*
the land involved was S. ½ N. E. ¼ and S. E. ¼, 16—44—5 W.
In the *Cumberland Case* the land was described as N. ½
N. E. ¼, of the same section. In the first case the court

found the plaintiff was the owner of the land described; that during the logging season of 1896–97, the defendants cut and removed therefrom 1,181,216 feet of logs, worth $2.25 per thousand feet, or $2,657.73; that the defendants entered in good faith, claiming under certain tax deeds from Bayfield county, issued in the sale of 1882, and recorded in 1885 and 1886; that the defendants showed no title to the N. E. ¼ S. E. ¼; that within three years from the date of the record of said deeds the plaintiff took open and notorious possession of said lands, and remained in possession from April 6, 1887, until about December 18, 1887. Judgment for the amount stated and costs was entered for plaintiff. In the other case the court's findings were the same except that the amount of timber cut was found to be 50,000 feet. Judgment was entered for $112.50 damages and costs for plaintiff. Due exceptions to the findings were filed, and the questions raised will be more fully stated in the opinion. The defendants in each case have appealed.

For the appellants there was a brief by *Tomkins & Merrill,* and oral argument by *W. M. Tomkins* and *A. W. Sanborn.*

For the respondents there was a brief by *S. J. Bradford,* attorney, and *Clapp & Macartney,* of counsel, and oral argument by *N. H. Clapp.*

BARDEEN, J. Two questions are presented for consideration: (1) Was the plaintiffs' occupation of the land sufficient to disengage the running of the bar of the statute in favor of the tax deed claimants? (2) Are the findings in regard to the value and amount of timber taken supported by the evidence?

1. At the time the tax deeds under which the defendants claim were recorded the lands were vacant and unoccupied. The plaintiffs held the original title. The lands were supposed to be what are called " iron lands." Early in 1887

the two corporations, acting jointly, employed a force of men to enter upon and explore these lands and the south-west quarter of the section for iron. The entry was made in April. The men entered upon the southeast quarter of the southeast quarter, and built a substantial log cabin eighteen by twenty-four feet, and continued to use and occupy it until December following. The average crew of men was seven or eight. Using the cabin as a base of operations, the testimony shows that the men explored for iron and dug test pits over the entire east half of the section. These operations continued during the entire summer and until late in the fall. During all this time the men were engaged in prospecting and digging pits here and there in search of mineral. The evidence is not very definite as to the amount of work done on each forty, but it is undisputed that these operations extended over the entire tract. The character of their work, the extent of their operations, and the length of time they were continued is significant. The possession was actual, open, visible, and continuous for a period of about eight months. It is deemed sufficient to bring it within a line of cases decided by this court beginning at an early day to the .effect that such possession disengages the bar of the statute in favor of the tax deed and creates a bar against it. *Sydnor v. Palmer,* 29 Wis. 226; *Lewis v. Disher,* 32 Wis. 504; *Haseltine v. Mosher,* 51 Wis. 443; *Smith v. Sherry,* 54 Wis. 114; *Finn v. Wis. River L. Co.* 72 Wis. 546. In other words, the constructive possession of the tax-deed claimant only ripens into an absolute title when the lands remain vacant and unoccupied *continuously* during the whole period named in the statute. *Cornell University v. Mead,* 80 Wis. 387. Applying the rule to this case, we find that defendants' constructive possession was interrupted for such a considerable period within the three years next after the recording of the tax deeds as to disengage the running of the statute in their favor, and to create a bar against them.

2. The court found the value of the timber taken to be $2.25 per thousand feet. This finding is based upon the testimony of two witnesses for plaintiffs fixing the stumpage value at $4, and is opposed by two witnesses for defendants, who examined the timber, and put its value at from seventy-five cents to $1 per thousand feet. Considering the defective character of the timber, we would have been better satisfied if the price had been somewhat reduced. Under the circumstances, however, we cannot say that it is so decidedly against the evidence as to require us to disturb the court's findings.

Upon the question of the quantity of the timber found, a much more serious difficulty arises. The plaintiffs' case is based entirely upon the testimony of the witnesses Johnson and Otness, who went to the land together some time after the timber was cut, and made a trespass scale. They made a measurement of thirty or forty trees, and averaged the rest. They made no allowance for the jump of the tree, or for rot or defects, except in a few cases where the stump indicated the tree was rotten. Generally speaking, their scale was a full scale of the entire timber cut as if it was sound, straight, and entirely merchantable. The court adopted such scale as the basis of plaintiffs' recovery, and in the *Midlothian Case* gave the plaintiff judgment for 1,181,216 feet at $2.25 per thousand, and in the other case for 50,000 feet at the same price. The plaintiffs' scale shows 3,191 logs in all. On the basis of the scale allowed by the court, this would make the logs run about 2.59 logs to the thousand feet, or 386 feet to the log. Opposed to this conclusion we have an estimate of the timber made by the witness Welcome, who fixed the amount of timber on the land at 950,000. We have the testimony of all the witnesses that the timber was very rotten and defective. The plaintiffs' scaler Johnson testifies that the timber was punky and contained "ring rot, center rot, and stump rot;" that

from one quarter to one third of the logs were left on the ground as defective, many of which he considered contained sufficient merchantable timber to warrant the hauling. The other witnesses say they were so defective as to be worthless. We have also the testimony of nearly all the witnesses who had seen the timber that it would run from four to five logs to the thousand feet. In addition to this, we have the testimony of the witness Arnott, who made an actual scale of the logs as they were delivered, on the basis of which scale the logs were sold by defendants. His scale was tested by the district scaler, and the two scales, it is said, " were about alike." Arnott's scale showed 3,393 logs, containing 820,890 feet, or about 242 feet to the log. It is an undisputed fact in the case that of the logs scaled by him there was 156,000 feet cut on state lands. This would leave 664,890 feet cut on the plaintiffs' lands. The manner in which plaintiffs' scale was made renders it of no greater value than a mere guess at the amount. It evidently included a scale of the entire amount of timber on the land, regardless of its defective character. It is further impeached by the extravagant size of the logs. The defendants' scale of the logs was made when they could be examined and their defective character ascertained. Moreover, it corresponds more nearly to the testimony in regard to the size of the logs. Under these circumstances the conclusion is irresistible that the court's findings as to the quantity of logs is unwarranted and ought not to be permitted to stand.

The testimony as to the amount of timber cut on the lands of the *Cumberland Company* is very meager and unsatisfactory. One witness says the amount was about 50,000 feet. No basis is furnished by the testimony that will permit us to disturb the court's finding in this case.

Our conclusion is that the evidence will not permit a finding of a greater amount than 664,890 feet on the entire tract of land, 50,000 feet of which were cut on the lands of the

*Cumberland Iron Mining Company.* This leaves 614,890.
feet that were cut on the *Midlothian* lands, which, at the
price of $2.25 per thousand feet, would reduce the recovery
in that case to $1,383.50 and interest from May 1, 1897.

*By the Court.*— In the case of the *Midlothian Iron Mining Company* the judgment is modified, with costs to appellants, to stand for the sum of $1,383.50 and interest from May
1, 1897. In the *Cumberland Iron Mining Company* case the
judgment is affirmed.